Nick K. Brooke
Stephens Brooke, P.C.
315 W. Pine
Missoula, MT 59802
Phone: (406) 721-0300
nick@stephensbrooke.com

Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>vs.<br><br>BRADY ALLEN BATISTA<br><br>      Defendant. | Cause No.: CR 25-32-M-DWM<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

Defendant Brady Batista, by and through counsel, Nick K. Brooke, STEPHENS BROOKE, P.C., gives the following sentencing memorandum. Batista requests this Court impose a sentence of one day on Counts I and X, followed by a sentence of 24 months on Count XX.

/

/

1

# **PSR OBJECTIONS**

The PSR accurately calculates the guidelines range as offense level 17 and criminal history category I for a total of 24-30 months on Counts I and X, followed by a mandatory 24 month sentence on Count XX.

The Defendant and the Government have entered a stipulation regarding restitution. That stipulation details the amount of restitution due to two victims: Steve Cooney and Zane Levengood.

The Defendant and Government disagree about restitution owed to a third victim, Brad Sandt. The Government contends that Sandt is owed $10,835.72. The Defense contends Sandt was owed $3,600, which was paid to Sandt during the pendency of this case and thus no further restitution is due to him.

Sandt had successfully purchased tickets from Batista for prior Super Bowls. Batista then promised to sell Sandt four tickets to Super Bowl 2025 for $1,800 per ticket. Sandt paid Batista $3,600 as a deposit. Sandt arranged travel and lodging, but when he arrived in New Orleans, found that Batista did not purchase any Super Bowl tickets on his behalf. Sandt then purchased four tickets on the morning of the game for a total $18,035.72 ($4,508.75 per ticket).

The Government contends that Sandt is due restitution for the difference between what Sandt paid and the price Batista promised.

The purpose of the MVRA is to make the victim whole. "Accordingly, it would be an abuse of discretion for a district court to issue a restitution award that makes a victim more than whole, such as by awarding a windfall." *United States v. Kaplan*, 839 F.3d 795, 802 (9th Cir. 2016).

Batista repeatedly over promised the discounts he could not actually obtain. When investigators contacted the relevant ticket sellers to determine the extent of the scheme, they discovered that Batista did have an opportunity to purchase tickets for the 2025 Super Bowl for prices around $11,875.00 a piece, processing fees included. In previous Super Bowls, Batista purchased tickets for as little as $4,600. But Batista promised Sandt four tickets at $1,800 per ticket, less than half of the lowest price he had ever paid. A summary of the tickets purchased in the scheme was created by the Government and is attached as Exhibit A.

The restitution sought by the Government would award Sandt a discounted price that did not actually exist. Batista was not able to obtain tickets close to the price he promised Sandt and other victims. Sandt could not have obtained that price elsewhere, which is why he went through Batista rather the purchase from traditional sellers. The price Sandt paid when he eventually purchased tickets himself was near the price actually paid by Batista in prior years. Sandt was entitled to a refund of his money, and Batista paid that while this case was pending.

Any further award would make Sandt more than whole, it would give him an added windfall.

## 18 U.S.C. § 3553(a) FACTORS

1. **The Offense**

*Wire Fraud and Money Laundering*

Batista made promises that he could not keep to many people, then told lies and made more unkeepable promises to prevent the discovery of his ruse.

Many people were harmed by Batista's conduct, but Zane Levengood was the main victim. Batista and Levengood met while working at the same real estate firm. After becoming quick friends, Batista offered Levengood a number of investment opportunities; to buy a home from Batista's parents in Helena; to invest in a Hawaii timeshare; to purchase a pontoon boat; to buy three rafts at wholesale prices; and to invest in a ticket selling business. But all of these were a ruse in whole or in part, and Batista often pocketed the money.

As Levengood became suspicious and started demanding repayment on various investments, Batista turned to defrauding other people to pay Levengood back and keep him at bay. When Cooney invested $133,000 into the ticket selling scheme, Batista used nearly all of that money to pay Levengood. Much of the money Batista accepted for Super Bowl tickets in smaller numbers went towards repaying Levengood as well.

Both before and during the pendency of this case, Batista has taken efforts to repay his victims, including Levengood. Batista repaid several individuals who purchased tickets through him by refunding the amount they paid him. Batista settled a lawsuit with Cooney for an amount exceeding the money Cooney originally paid him. Before this case was referred for investigation, Batista paid Levengood a total $270,000, and after the case was charged Batista repaid Levengood and additional $100,000. Batista continues to solicit help from family and friends for a loan so he can repay Levengood additional sums. Batista is committed to making right with his remaining victim.

*Aggravated Identity Theft*

Aggravated Identity Theft is typically charged in cases where the main victim is the one whose identity is being stolen. In determining the congressional intent of the statute, the Supreme Court recognized the law is usually meant to apply to "classic identity theft:" "There is the defendant [who] has gone through someone else's trash to find discarded credit card and bank statements, and thus has taken possession unlawfully. There is the bank employee who passes along customer information to an accomplice, and thus transfers it unlawfully. Then there is use involving fraud or deceit about identity: a defendant [who] has used another person's identification information to get access to that person's bank account." *Dubin v. United States*, 599 U.S. 110, 126, 143 S. Ct. 1557, 1570, 216 L. Ed. 2d

136 (2023) (*quoting and discussing Flores-Figueroa v. United States*, 556 U.S. 646, 656, 129 S. Ct. 1886, 1893, 173 L. Ed. 2d 853 (2009)).

Here, Batista never stole the identities of Levengood or Cooney, rather he posed as various individuals in service of defrauding Levengood and Cooney. Batista made up emails pretending to be Dave Paoli, or various sales reps for a ticket seller. Batista concocted messages pretending to be a family friend willing to sell a boat to Levengood.

This distinction does not excuse Batista's conduct. Certainly, a single instance of posing as an attorney or a sales rep or a family friend does at least some damage to that person's reputation. But this harsh mandatory minimum was primarily designed for those offenders who use a person's identification to defraud that same person. In this case, the instances of identity theft were nearly all peripheral to the main crime of defrauding Levengood and, to a lesser extent, Cooney.

2. **Nature and Characteristics of the Offender**

Until this offense, Batista was a law abiding and productive member of society. Batista is a Zero Point Offender and has received a reduction under the Guidelines for his lack of criminal history. A study by the Sentencing Commission found that zero point offenders are dramatically less likely to reoffend, nearly half as likely to reoffend as offenders with one criminal history point. U.S. Sentencing

6

Commission, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), 27, available at www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010. After this conviction, it is unlikely that Batista will commit another crime to bring him before this Court.

The main driver of Batista's conduct in this case was a combination of mental health and addiction issues. As detailed in the PSR, Batista struggled with substance abuse off and on throughout his youth and college years. Starting in 2021, Batista started drinking to intoxication daily. He also started a habit that has become an increasingly alarming addiction among young men in this country: sports betting.

Since the legalization of sports betting in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 138 S. Ct. 1461 (2018), there has been an explosion of sports betting, and an accompanying rise in gambling addiction. As states invited sports betting apps to do business, calls to gambling helplines and searches for gambling addiction increased dramatically. Yeola A, Allen MR, Desai N, et al., Growing Health Concern Regarding Gambling Addiction in the Age of Sportsbooks. JAMA Intern Med. 2025;185(4):382–389. Accessed at <jamanetwork.com/journals/jamainternalmedicine/fullarticle/2830019#>. A UCLA study found an increase in bankruptcies and a decrease in average credit scores in the years after a state allowed sports betting. Hollenbeck, Brett and Larsen, Poet and Proserpio, Davide,

The Financial Consequences of Legalized Sports Gambling (December 08, 2025). Accessed at <ssrn.com/abstract=4903302>.

The money Batista received from this fraud was spent on sports gambling multiple times per week, often losing hundreds or thousands in a single week. It was also spent on drinking, credit card debt, and living a lifestyle that was not unusual or overly luxurious, but was well beyond Batista's means. Batista used a chunk of the money for the down payment on his home, then lied to his wife about the provenance of that money. Outside of this, the Government's investigation did not discover lavish spending, outlandish expenses, or major assets. Some of Batista's conduct can be explained by sheer greed, but impulse and financial distress explain far more of this story.

Batista has taken efforts to address his addiction and behavioral issues. He has engaged in weekly counsel and attends AA meetings. He remained employed as a sales representative for various brands during the pendency of this case, but had to terminate his employment in anticipation of this sentencing. He is taking great measures to correct his course and reform his life, even in anticipation of incarceration.

3. **Need to Provide the Defendant with Education, Training, or Medical Care**

Batista understands he will be incarcerated and requests a recommendation for placement in the Residential Drug and Alcohol Treatment Program (RDAP).

Batista has survived a battle with cancer and is thankfully in remission. However, he continues to seek medical care for a buildup of fluid on his head and neck. This edema has caused chronic migraines and other nerve pain in his head and neck. Batista has had appointments to treat and diagnose this throughout the pendency of this case, and continues to attend follow up appointments with neurology specialists.

Batista has adequate medical care currently, but would likely be put in a long line for specialist treatment while incarcerated. A shorter sentence is more likely to benefit Batista's health than a lengthy term.

## **CONCLUSION**

Batista requests this court impose a sentence of one day on Counts I and X, followed by a sentence of 24 months on Count XX.

Respectfully submitted this 10th day of February, 2026.

                                                      By: /s/ Nick K. Brooke
                                                      Nick K. Brooke
                                                      Counsel for the Defendant

# CERTIFICATE OF SERVICE

I, Nick K. Brooke, do hereby certify that a true and correct copy of the foregoing was served upon the following by the means indicated.

Tim Racicot                                              [x] CM/ECF
*Assistant United State's Attorney*

Dated this 10th day of February, 2026.

By: /s/ Nick K. Brooke  
Nick K. Brooke  
Counsel for the Defendant